## SUPREME COURT.

THE PEOPLE, plaintiffs in error agt. MARY HARTUNG, defend-
ant in error.

A *writ of error* in a criminal case, under the act of 1852, lies on behalf of the
*people*, as well from the *supreme court* as from the court of appeals. And this,
though the writ from the supreme court is brought to bring up a judgment of the
oyer and terminer *on demurrer* to special pleas interposed to the trial of an
indictment.

Where the defendant was tried and convicted of the crime of *murder*, and sen-
tenced to be hung, and during such sentence a law was passed by the legislature,
which repealed the statute under which the sentence was made, and thereby
made the judgment of the supreme court—(the sentence)—erroneous, and no
other valid law being applicable to the case, the court of appeals *reversed* the
judgment of the supreme court, for such error, and ordered a *new trial*,

*Held*, on demurrer, that the *special pleas* of the defendant interposed against a
new trial in the oyer and terminer, on the ground, 1st, of a former conviction for
the same offence; 2d, of jeopardy; and 3d, of a (legislative) pardon, could not
be sustained.

*Albany General Term, March,* 1862.

HOGEBOOM, PECKHAM and MILLER, *Justices.*

MARY HARTUNG, the defendant in error, at the June term
of the Albany county sessions, was indicted for the murder
of Emil Hartung, her husband, by administering to him
poison. She was tried upon the indictment at the January
oyer and terminer, 1859, and found guilty as indicted, and
on the third day of March, 1859, sentence of death was
pronounced against her, and she was ordered to be exe-
cuted on the 27th day of April, 1859. A writ of error was
issued out of the supreme court on the 23d day of April,
1859, and allowed with a stay of proceedings, by Justice
WRIGHT, and on the 16th day of December, 1859, this
court, at general term, affirmed the judgment of the oyer
and terminer, and directed the oyer and terminer to pro-
ceed to the execution of the judgment, Justice WRIGHT
dissenting.

On the tenth day of January, 1860, a writ of error was
issued out of the court of appeals, and allowed by Justice

WRIGHT, with a stay, and the return to this writ was filed in the court of appeals on the third day of March, 1860. On the 13th day of October, 1860, the court of appeals reversed the judgments of the supreme court and of the oyer and terminer, and granted a new trial to the defendant in error. On the 30th day of September, 1861, the remittitur from the court of appeals was filed by the district attorney in the court of oyer and terminer of the county of Albany, which was then in session.

On the same day the defendant, by leave of the oyer and terminer, Justice WRIGHT presiding, filed three special pleas in bar to the indictment, to wit : A plea of *autre fois convict;* a plea that her life has once been in jeopardy; and a plea of legislative pardon, by reason of the passage of the act of 1860, entitled " An act in relation to capital punishment, and to provide for the more certain punishment of the crime of murder," passed April 14th, 1860.

On the same day the district attorney, on behalf of the people, filed replications to these pleas, to wit : to the two first, that the judgment of the oyer and terminer had been in all things reversed and annulled ; and to the third plea, that the act of 1860 had been repealed by the act of 1861, and that by the latter act the provisions of the Revised Statutes repealed by the former act, had been revived and made operative as to cases of murder committed before its passage.

The defendant in error interposed general demurrers to these replications, and the people joined in demurrer. The questions raised by the demurrers were argued before the oyer and terminer on the 20th day of November, 1861, and on the 12th day of December last the oyer and terminer, Justice WRIGHT presiding, rendered judgment for the defendant in error on the demurrers, and ordered her to be discharged from the custody of the sheriff.

On the same day a writ of error was issued out of the supreme court, on behalf of the people, and allowed by

Justice PECKHAM, with a stay of proceedings, and the return thereto was filed in this court on the 8th day of February last.

The issues presented by the pleadings are in substance as follows :

The demurrer book opens with an indictment for murder, in the usual form by the people, against the defendant, charging her with the murder of her husband, Emil Hartung, on the 10th day of April, 1858, the indictment having been preferred in June, 1858. No question is made as to the validity or legal sufficiency of the indictment. Of course it charges her simply with the commission of the murder, without any allegation or suggestion of the punishment affixed by law to the crime. No such allegation would have been proper, inasmuch as the object of the issue to be presented for trial was to ascertain whether the defendant was *guilty* of the *crime* charged against her.

The indictment having, as appears by a suggestion to that effect, been removed into the oyer and terminer, the defendant, in September, 1861, on leave granted, interposed three special pleas in bar : 1. A plea of a former conviction for the same offence ; 2. A plea of jeopardy ; 3. A pardon.

1. The first plea alleges that the defendant having pleaded not guilty to the indictment, was brought to trial thereon at the Albany oyer and terminer, in January, 1859, found guilty of murder, and thereupon sentenced to be hung on the 27th day of April, 1859. Wherefore she prays judgment for a discharge from further prosecution upon the said indictment.

To this plea the people reply, that in April and May, 1859, the record and proceedings upon said indictment were duly removed into the supreme court, and in December, 1859, in all things *affirmed;* that in March, 1860, the said record and proceedings were removed into the court of appeals, and in October, 1860, in all things *reversed,*

and a new trial was granted to the defendant upon the said indictment, and the proceedings remitted to the court of oyer and terminer, to be proceeded upon according to law; that said record and proceedings were reversed upon the grounds stated in the published opinion of the court as delivered by HIRAM DENIO, one of the judges thereof, and by reference thereto incorporated in the said replication. Wherefore they pray judgment that the defendant answer to said indictment, and be again tried thereon, and that the people may prosecute the same, notwithstanding the trial, conviction, sentence and judgment set forth in the plea of the said defendant.

To this replication the defendant interposed a general demurrer, and the people joined in demurrer.

2. The second plea, after setting forth that the defendant pleaded not guilty to the said indictment, and was on trial convicted thereon, in January, 1859, and in March thereafter, sentenced to be hung, alleges that she thereby was *once* put in *jeopardy* of her life for the said felony and murder. Wherefore she prays judgment, and that she may be discharged from all further prosecution on account thereof.

To this the people reply, that after such trial, conviction and sentence, the said record and proceedings were removed into the supreme court, and in December, 1859, in all things *affirmed*, and thereafter removed into the court of appeals, and in October, 1860, in all things *reversed*, and a new trial granted to the defendant thereon, and the proceedings remitted to the court of oyer and terminer, to be proceeded upon according to law, upon the grounds stated in the opinion of Judge DENIO, incorporated by reference into the said replication. Wherefore they say, the defendant has not been once put in jeopardy of her life, and pray judgment that she may answer to the said indictment, and be again tried thereon, and that the people may be permitted to prosecute the same.

To this replication there was a general demurrer by the defendant, and a joinder on the part of the people.

3. The third plea alleges that the defendant was indicted, tried, convicted and sentenced, as set forth in the two previous pleas, and that thereafter, and on the 14th day of April, 1860, the legislature of the state of New York passed the act modifying the crime and punishment of murder, reciting the whole of the same, and alleging that by the force and effect thereof, the said felony and murder, and the said indictment, and all further proceedings thereon, were discharged. Wherefore she prayed judgment for such discharge.

To this plea the people reply, that such proceedings were had in the supreme court and in the court of appeals, as are set forth in the previous replications, and that the proceedings were remitted, pursuant to the order of the latter court, to the court of oyer and terminer, to be there proceeded thereon according to law, and that before the making and filing of the said third plea, and on the 17th day of April, 1861, the legislature passed the law of that year in relation to the crimes of murder and arson, reciting the provisions thereof at length, and alleges that by reason of the premises the people are authorized to try the said defendant for the said felony and murder, and therefore pray that she may answer the said indictment and be again tried thereon, and the people be permitted to prosecute the same.

To this replication there was a general demurrer, and the people joined in demurrer. After argument, the court of oyer and terminer held the replications insufficient, and the pleas in bar good and sufficient to preclude the people from a further prosecution of the indictment, and gave judgment for her discharge. The people thereupon brought error to this court.

IRA SHAFER, *district attorney, for People, pl'ff in error.*
WM. J. HADLEY, *for prisoner, defendant in error.*

By the court, HOGEBOOM, Justice.   This case arises on a writ of error brought by the people, to review a judgment rendered in favor of the defendant in the court of oyer and terminer of the county of Albany, and we are met at the threshold with the objection that a writ of error from the supreme court does not lie in behalf of the people in a criminal case.   Whatever may have been the rule formerly, and the authorities are conflicting, I think, since the statute of 1852, the objection is unavailable.   That statute provides (*Laws of* 1852, *ch.* 82) that " writs of error to review any judgment rendered in favor of any defendant upon any indictment for any criminal offence, except where such defendant shall have been acquitted by a jury, may be brought in behalf of the people of this state by the district attorney of the county where such judgment shall be rendered, upon the same being allowed by a justice of the supreme court ; and the court of appeals shall have full power to review by writ of error in behalf of the people any such judgment rendered in the supreme court in favor of any defendant charged with a criminal offence."

The language is full and comprehensive, and clearly embraces a judgment arising on demurrer.   Nor can the words of the statute, by any fair construction, be so interpreted as to authorize a writ of error *alone* from the court of appeals.

There are two clauses to the section ;  they are connected by the copulative conjunction ;  they are susceptible of being construed as referring to distinct writs of error. Such is their natural meaning, and it would be a mere useless repetition of words if it were only intended to confer the right of review by writ of error in behalf of the people, to the court of appeals.   I cannot give the statute such an interpretation.   I think, therefore, this writ of error was well brought.

Passing then to the merits.   The brief history of this case, independent of the pleadings, is, that the prisoner

having been convicted in 1859, of the murder of her husband, was, by the court of oyer and terminer of Albany county, sentenced to be hung; that on appeal to the supreme court, the judgment was in the same year *affirmed;* that on further appeal to the court of appeals, that court, in October, 1860, *reversed* the judgment, and *ordered a new trial,* and directed the proceedings to be remitted to the Albany oyer and terminer for further action.

The reversal was made upon the ground that the legislature having, in April, 1860, repealed that section of the Revised Statutes which prescribed hanging by the neck as the mode of inflicting the punishment of death, there was no longer any statutory mode provided for inflicting capital punishment, and hence that the punishment by hanging was unauthorized; and also upon the ground that the section of the act of 1860, which imposed the punishment prescribed in that act for murder in the first degree, to wit, death, *preceded by at least one year's confinement at hard labor in the state prison,* upon offenders already under sentence of death, was an *ex post facto* law, and unconstitutional and void, inasmuch as it imposed a severer punishment than was attached to the crime when it was committed. In 1861, the legislature enacted another law, by which all the provisions of law in regard to the crime and punishment of murder, in force at the time of the passage of the act of 1860, were revived, made operative, and declared to be in full force and effect in respect to offences committed before the 4th of May, 1860. This act, if valid, restored the provisions of the Revised Statutes, and the question before us, divested of all embarrassments arising under the pleadings is, whether the prisoner is, under these circumstances, triable for the offence of murder; and also whether there is any such crime as murder, as applied to acts committed before the 4th day of May, 1860, (when the act of 1860 took effect.)

The prisoner holds the negative of these propositions, and claims :

1. That she has been once legally tried, and convicted and sentenced to death, in proceedings free from legal error, and therefore cannot be subjected to a second trial, nor to a new peril of life or limb.

2. That the act of 1860 operates as a pardon of all offences previously committed, and has the same legal effect as a parliamentary or legislative pardon.

3. That the act of 1861 is inoperative and inapplicable to her case, and that she acquired rights under the act of 1860 which cannot be divested or taken away by the act of 1861.

4. That under the act of 1861, there is no provision for the punishment of murder committed before 1860, and that the act of 1861 is null and void.

I will briefly consider each of these propositions.

1. I am of opinion that the plea of a former conviction or jeopardy (considered independent of the act of 1860, which will be hereafter examined) cannot be sustained.

The former conviction, although affirmed in the supreme court, was *reversed* in the court of appeals, and a *new trial ordered.* That reversal proceeded upon the ground that there were *errors in the record;* for although the judicial proceedings of the courts below were declared to have been free from error at the time they took place, the statute of 1860, in the opinion of the court, stamped them with error, which vitiated the whole proceedings, and penetrated the record itself. It was as if the legislature, in the exercise of a competent authority, had passed an act declaring the conviction void, and annulling the same. The statute became so far a part of the record, that the latter must be read in connection with it, and as explained or affected by it. The court say, that error in the record " is ascertained by applying the law to the judgment contained in the record, and ascertaining whether the latter

is supported by the former;" and that if this is done in connection with the doctrine " that when a statute is repealed, it must be considered as if it had never been enacted, we cannot fail to see that the *judgment* is erroneous." They proceed to say, in substance, that the *errors in the record* are such as would cause the judgment to be arrested, and therefore should lead to its reversal on error. They further say : " In conclusion, therefore, we determine that the judgment under review is erroneous, because there is not at this time any law which authorizes or sustains it, or which would warrant its execution." ˑ

It is established by all the authorities, and conceded by the counsel on both sides, that if the judgment is reversed for errors in the record, that is, because it is in itself erroneous, a plea of former conviction or former acquittal is of no avail. There has been no legal jeopardy, and no constitutional provision or personal right is invaded by subjecting the party to another trial.

That there was, in the opinion of the court of appeals, error in the proceedings, and such error as would not necessarily be fatal to a conviction on a second trial, is apparent also from the order of the court directing a *new trial* to be had, and that the proceedings be remitted to the oyer and terminer for that purpose. Such an order the court of appeals had jurisdiction and competent authority to make, and it is not for us, nor for the court of oyer and terminer, in my opinion, to question the correctness of their decision. They have made the *order*, and are responsible for it, and the duty of the court of oyer and terminer is to obey it and carry it into effect. No new facts have since arisen, making the obligation of obedience to the mandate of the higher power less imperative than it was when the mandate was issued. Surely, it will not be contended that the provisions of the act of 1861 alter the case *favorably to the prisoner*. If, in view of the act of 1860, the court of appeals were constrained to order a new

trial, it cannot be pretended that there was anything in the act of 1861 which would make them less disposed to do it.

I am of opinion, therefore, that the pleas of former conviction and jeopardy are untenable, and that the case must turn upon the construction to be given to the acts of 1860 and 1861, and to them, therefore, we must direct our attention.

2. In relation to the act of 1860, the substance of the argument of the prisoner's counsel, if I understand it, is, in the first place, that, so far as it attempts to apply the penalties of that act to previous offences, it is unconstitutional and void.

This proposition I understand the court of appeals to sustain, and without examining or discussing its correctness, I yield to its authority.

The argument is, in the second place, that inasmuch as the legislature, by the act of 1860, expressly repealed section 25 of that part of the Revised Statutes, being the section which declares that the mode of inflicting capital punishment shall be by hanging the offender by the neck until he be dead ; and inasmuch as they did not, by the act of 1860, substitute any other mode of inflicting capital punishment, and inasmuch as the Revised Statutes provide (2 R. S., 701, § 16) that "all punishments prescribed by the common law for any offence specified in this chapter, [which chapter includes murder,] and for the punishment of which provision is herein made, are prohibited," therefore there is no mode of punishment for the offence of murder (as applied to offences committed before the act of 1860) prescribed either by the common or statute law, and hence that in the most unfavorable view to be taken of the case, for the prisoner, murder in the given case is a crime for which no mode of punishment is prescribed, and for which, therefore, no punishment was intended to be or can legally be inflicted.

In reference to the construction to be given to this act,

there are several matters which I think are deserving of attention.

1. The *crime* of murder is not abolished. The sections defining it in the Revised Statutes, are not repealed, nor are they modified except by implication, and only so far as the definition of the crime in the act of 1860 differs from that contained in the Revised Statutes. It is obvious, therefore, that the wilful and premeditated act of killing another, without just cause, and with malice aforethought, was not intended to be declared a lawful or innocent act.

2. It is further obvious that the offence of murder was, by the act of 1860, designed to be punished with death. Section 1 declares that " no crime hereafter committed, *except* treason, and murder of the first degree, shall be punished with death." Section 4 recognizes such punishment, and the propriety of a sentence to that effect, by declaring that " when any person shall be convicted of any crime punishable with death, and sentenced to suffer such punishment, he shall at the same time be sentenced to confinement at hard labor in the state prison until such punishment of death shall be inflicted." Section 5 forbids any offender to be *executed* until after the lapse of a year from the sentence, and after that, authorizes a warrant from the Governor " commanding the said sentence of death to be carried into execution." Section 9 declares that " the provisions of this act for the punishment of murder in the first degree, shall apply to the crime of treason." There are no provisions in the act for the punishment of murder in the first degree, except those before cited, and if they do not authorize the punishment of death, then murder in the first degree, committed between the passage of the acts of 1860 and 1861, is not punishable at all, except possibly by temporary imprisonment, and that is doubtful, because the sentence of imprisonment must be contemporaneous with the sentence of death.

I think it may be safely assumed, therefore, that the pun-

ishment of death was not intended to be, and was not, abrogated by the act of 1860, but that on the contrary it was intended to be preserved and imposed upon the guilty. The same conclusion is arrived at in the opinion pronounced in the court of appeals.

3. Suppose no further legislation had been had upon the subject beyond the Revised Statutes and the act of 1860, would it be illegal to try a prisoner lawfully indicted for the crime of murder, who had pleaded not guilty to such indictment? The crime being defined, and the punishment of death denounced against it by law, could it be said that here was no offence which a court was competent to try? Without further legislative provision, might not a court *sentence* the prisoner to death? Would it be illegal to declare in such sentence the *time* and the *mode* in which the sentence should be executed, so that it be not cruel or unusual, or violative of any provision of statute or common law? Would not the absence of any legislative provision on the subject amount to an implied authority to the judiciary to regulate the *mode* of administering the punishment in any manner consistent with humanity and law? Suppose, under the old law nothing had been prescribed in regard to the punishment of death, except that the party should be hung, would it not be competent to the courts to fix the *time* and the *place* and the *mode*, whether *public* or *private*? It is of necessity impracticable to embrace all details in a legislative act, and so far as the legislature are silent, I apprehend it would be inferred that the *mode* and *nachinery* of carrying out the legislative will were purposely left to the judiciary, so long as the main purpose of the act was subserved.

4. However that may be, and whether the foregoing remarks as to the power of the courts be well founded or not, it must be conceded to be a power which the courts, in the absence of an express statute, would be most reluctant to exercise, and which ought to be regulated by posi-

tive law. This has been attempted to be done by the act of 1861, and I think the act is valid. In effect, and when construed in connection with the unrepealed portion of the act of 1860, it merely prescribes the *mode* of inflicting the death penalty; a penalty imposed by a previous statute.

I am of opinion that this could legally be done, and made applicable to past offences. It is merely declaring *how* the punishment of death shall be inflicted. The mode adopted is no more severe than was the mode in force when the crime was committed; it is precisely the same. So long as such mode was not cruel or unusual; so long as it imposed no severer penalty than was attached to it when the crime was committed, I do not see that the prisoner had any cause to complain. I think it contravenes no constitutional provision, nor invades any of those natural and fundamental barriers thrown around life and liberty by the bill of rights. The court of appeals, in their opinion, say : "Any change [in the mode of punishment] which should be referable to prison discipline or penal administration, as its primary object, might also be made to take effect upon past as well as future offences, as changes in the manner or kind of employment of convicts sentenced to hard labor, the system of supervision, the means of restraint, or the like. Changes of this sort might operate to increase or mititigate the severity of the punishment of the convict, but would not raise any question under the constitutional provision we are considering." I do not, therefore, perceive any legal or constitutional objection to the re-trial of the prisoner, unless the issues raised by the pleadings forbid it.

And I do not see that these raise any new question beyond those already examined. As to the plea of a former conviction and of former jeopardy, I have already expressed the opinion that they are unavailable to the prisoner, because the former judgment, in the eye of the

law, was not free from error, and because it was reversed for errors in the record.

It is suggested in the argument of the counsel for the prisoner, that the error book contains an express admission that " the indictment, trial and conviction were in all respects valid and legal, and have not been in any respect reversed, or made void for any insufficiency or legal error therein committed." But I find no such admission, either in terms or substance ; on the contrary, the replications expressly aver that the reversal was founded upon the grounds expressed in the opinion of the court. I have also expressed the opinion, that the act of 1860 did not amount to a legislative pardon ; that neither its object nor its effect was to extend immunity to the offender, and that at no period since the alleged commission of the offence by the prisoner, has murder ceased to be a crime, or its commission been subject to a milder punishment than death. There was, therefore, no remission of the offence, either tacit or express. The *mode* of enforcing the punishment prescribed in the act of 1861 is no more than a regulation of the details and machinery necessary for the purpose of carrying the punishment into effect, and not being cruel or unusual in its nature, could have had no influence in inviting to or deterring from the commission of the crime ; nor does it justly subject the legislature or the courts to the imputation of passing or enforcing an *ex post facto* law, or one which savors of inhumanity or injustice to the prisoner.

In my opinion, the replications are all good in substance, however unartificial they may be in form for attempting to incorporate with them, by mere reference, the whole of the published opinion of the court.

I think the judgment of the court of oyer and terminer should be reversed, and the several demurrers to the replications overruled, with leave to the defendant to rejoin thereto, or to withdraw the special pleas in bar, and to

proceed to trial upon the plea of not guilty interposed to the indictment, and that the proceedings be remitted to the court of oyer and terminer, with directions to proceed in the cause in conformity with the order of this court.

PECKHAM and MILLER, J. J., concurred in the result of the foregoing opinion.

NOTE.—It is difficult to understand upon what ground, or by what authority, the court of appeals ordered a *new trial* in this case. After an able opinion of the court, by Judge DENIO, reviewing and discussing the cases where judgments were arrested, because the laws which gave the penalties or created the offence had been repealed, even after trial and conviction, he says: "In conclusion, therefore, we determine that the judgment under review is *erroneous, because there is not at this time any law which authorizes or sustains it, or which would warrant its execution.*" Not one word is said or reference made to any other error in the judgment and proceedings brought up for review. The law of 1860, as construed and applied by the court, created the only error upon which the judgment was reversed and this error was fatal. The *law reversed the judgment,* and consequently discharged the prisoner. What further jurisdiction of the case had the court of appeals, after announcing what the law required? Especially what jurisdiction to retain the prisoner for a new trial, when the law had left nothing upon which a new trial could be based? The crime and conviction of murder were merged in the judgment of the court below, and that judgment was sentence of death. This judgment, upon review, was found to be erroneous, because an act of the legislature had stepped in and repealed the law under which it was made, and no other law having been provided to carry the judgment into execution, it was a mere *pro forma* act of the court of appeals to announce the decision of *judgment of reversal,* only.— REP.